UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. ATTORNEY
FOR THE S.D.N.Y.

JUL 19 2018

- - - - - - - - - - - - - - - - - :

In Re:                              :

Any and all funds in account number
561782624838 held in the name of    :
Shengtong Technology Limited
located at HSBC in Hong Kong;        :

Any and all funds in account number :
201106696230 held in the name of
Nicholas Anamo located at Guaranty   :
Trust Bank in Ghana;

                                     :

- - - - - - - - - - - - - - - - - X

18MISC    341

CONSENT RESTRAINING
ORDER PURSUANT TO
18 U.S.C. § 981, 21 U.S.C.
853, and 28 U.S.C. § 2461

18 Misc.    **JUDGE SEIBEL**

WHEREAS, this matter arises out of an investigation conducted by the United States Attorney's Office for the Southern District of New York into a wire fraud scheme operated by Douglas E. Castle and other individuals in violation of 18 U.S.C. § 1343;

WHEREAS, a complaint was filed on or about February 13, 2018, captioned United States v. Castle, 18 mag. 1170 (S.D.N.Y), and attached as Exhibit A, charging Castle with one count of wire fraud in connection with his use of interstate wire communications to solicit over $750,000 in loans from victims through false and fraudulent representations as to how the money would be used;

WHEREAS, in connection with this alleged scheme, on or about November 22, 2016 and November 23, 2016, Douglas E. Castle allegedly directed an individual to send $50,000 to account number

1

561782624838 held in the name of Shengtong Technology Limited located at HSBC in Hong Kong (the "Hong Kong Account"), and this sum was in fact sent to the Hong Kong Account;

WHEREAS in connection with this alleged scheme, on or about February 28, 2017, Douglas E. Castle, through his company Global Edge Technologies Group, LLC sent $49,990 in proceeds of this alleged scheme to the Hong Kong Account;

WHEREAS the $99,990 in funds sent or caused to be sent by Castle to the Hong Kong Account remain in the Hong Kong Account;

WHEREAS in connection with this alleged scheme, on or about May 9, 2016, Douglas E. Castle, through his company Global Edge Technologies Group, LLC sent $200,000 in proceeds of this alleged scheme to an account number 201106696230 in the name of Nicholas Anamo in Guaranty Trust Bank in Ghana (the "Ghana Account");

WHEREAS the $200,000 in funds caused to be sent by Castle to the Ghana Account remain in the Ghana Account;

WHEREAS, Title 21, United States Code, Section 853(e) empowers courts to issue restraining orders and take other actions to preserve the availability of property for forfeiture;

WHEREAS, the Government has identified the following property sent by or at the direction of Douglas E. Castle that it

believes constitute proceeds of wire fraud, and are thus subject to criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461:

    a) Any and all funds in account number 561782624838 held in the name of Shengtong Technology Limited located at HSBC in Hong Kong;

    b) Any and all funds in account number 201106696230 held in the name of Nicholas Anamo located at Guaranty Trust Bank in Ghana;

    (the "Subject Property").

WHEREAS, the Government and Douglas E. Castle have agreed that the Subject Property should be restrained pending the resolution of the criminal investigation;

IT IS HEREBY STIPULATED AND AGREED, by and between the United States of America, by its attorney Geoffrey S. Berman, United States Attorney, Assistant United States Attorney Vladislav Vainberg, of counsel, and Douglas E. Castle, and his counsel, Rachel Martin, Esq., that:

1.   Douglas E. Castle, and all attorneys and other persons and entities acting for or in concert with the above-named individual, businesses and/or entities having actual knowledge of this Order shall not take any action prohibited by this Consent Restraining Order;

3

2.    Douglas E. Castle and all attorneys, agents, employees and anyone acting on their behalf, and all persons or entities acting in concert or participation with any of the above, all relevant financial institutions, and all persons and entities having actual knowledge of this Consent Restraining Order, shall not, directly or indirectly, transfer, sell, assign, pledge, hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold, assigned, pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken, any action that would have the effect of depreciating, damaging, or in any way diminishing the value of the Subject Property.

3.    The United States Attorney's Office for the Southern District of New York, in its discretion, is authorized to direct the release of assets restrained herein. The entities listed in this Order where Douglas E. Castle sent or maintained assets may contact the following Assistant United States Attorney to clarify the scope of the Order:  Assistant United States Attorney Vladislav Vainberg, telephone number (914)993-1903 or vladislav.vainberg@usdoj.gov. Those entities will not be deemed in violation of this Consent Restraining Order for any transactions undertaken upon written approval made by the aforementioned Assistant United States Attorney.

4

4.     This Consent Restraining Order shall be binding upon Douglas E. Castle, his attorneys, agents, and employees, and all persons in active concert or participation with any of the above, all entities described herein, or any other person having actual knowledge of this Consent Restraining Order, and that this Order shall remain in effect until further order of this Court;

5.     Upon request by the Government, the above identified financial institutions HSBC and Guaranty Trust Bank will identify the account name, account number and signatories for the restrained accounts and provide the Government with monthly statements of the restrained accounts and the balance in the accounts; and

6.     Any entity named herein shall accept service of this Consent Restraining Order by email or facsimile transmission provided that an original hard copy is thereafter served by regular mail upon the request of the entity;

7.     The signature page of this Consent Restraining Order may be executed in one or more counterparts, each of which will be

deemed an original but all of which together will constitute one and
the same instrument.

AGREED AND CONSENTED TO:

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____        7/19/2018
    VLADISLAV VAINBERG                         _____
    Assistant United States Attorney          DATE
    300 Quarropas Street,
    White Plains, NY 10601
    (914)993-1932


DOUGLAS E. CASTLE

By: _____        7/19/2018
    DOUGLAS E. CASTLE                          _____
                                               DATE

By: _____        7/19/2018
    RACHEL MARTIN, Esq.                        _____
    Attorney for Douglas E. Castle             DATE


SO ORDERED:


_____        _____
HONORABLE                               DATE
UNITED STATES DISTRICT JUDGE

6

EXHIBIT A

Approved: _Gillian Grossman_____
VladislavVainberg / Gillian Grossman
Assistant United States Attorneys

Before:       THE HONORABLE PAUL E. DAVISON
              United States Magistrate Judge
              Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| UNITED STATES OF AMERICA | SEALED COMPLAINT |
| | : |
| - v. - | Violations of 18 U.S.C. |
| | : §§ 1343 and 2, 1957 |
| DOUGLAS E. CASTLE, | : COUNTY OF OFFENSE: |
| | WESTCHESTER |
| Defendant. | : 18 m 117 C |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

DANIE S. SAMUEL, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Wire Fraud)

1.      From at least in or about 2014 through at least in or about 2017, in the Southern District of New York and elsewhere, DOUGLAS E. CASTLE, the defendant, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CASTLE used interstate wire communications to solicit over $750,000 in loans from at least two victims through false and fraudulent representations, including that the money would be invested with a specified United Kingdom-based investment firm, or with a business associate with whom CASTLE completed multiple prior successful investments, when in fact, CASTLE used the funds for his personal expenses and sent it to recipients in Ghana who had never previously returned any transferred money to CASTLE.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

2.      I am a Special Agent with the FBI and I have been personally involved in the

investigation of this matter. I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, as well as witnesses, review of recorded telephone calls, my review of email communications provided consensually by victims or through court-authorized search warrants, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.

## Overview

3.      For over a year, I have been involved in an investigation of DOUGLAS E. CASTLE, the defendant, and others. Based on the investigation to date, there is probable cause to believe that beginning in at least about 2014, DOUGLAS E. CASTLE, the defendant, engaged in a wire fraud scheme to induce victims to loan him money based on misrepresentations and false pretenses.

a.      CASTLE induced the first victim ("Victim-1") to loan CASTLE at least $525,000 based on numerous false representations, including that CASTLE would invest Victim-1's money along with his own investments through a United Kingdom-based investment firm named CapGrow that guaranteed the return, at a minimum, of the principal. CASTLE executed various promissory notes guaranteeing that Victim-1 would be repaid the entire principal invested plus specified interest. In fact, CASTLE did not invest Victim-1's money with any U.K. investment firm, but instead used the money to pay his own personal expenses and transfer funds to recipients in Ghana who promised CASTLE millions of dollars upon his payment of various fees.

b.      CASTLE induced the second victim ("Victim-2") to loan CASTLE at least $250,000 based on numerous false representations, including that CASTLE would invest the money through a business associate identified by CASTLE ("Business Associate-1") with whom CASTLE completed multiple prior successful investments. CASTLE executed two promissory notes guaranteeing that CASTLE would repay Victim-2 the principal invested. In fact, CASTLE had never completed a successful investment with Business Associate-1. In making the foregoing solicitation of Victim-2, CASTLE fraudulently concealed from Victim-2 that CASTLE had previously sent over one hundred thousand dollars to accounts in Ghana at the direction of Business Associate-1 without ever obtaining any repayment. CASTLE has not repaid any of the money to Victim-2.

## Fraudulent Solicitations Of Victim-1

4.      During the course of this investigation, I have spoken with Victim-1, other individuals, and other law enforcement agents. I have examined various reports and records, including financial records pertaining to Victim-1 and CASTLE. In addition, I have reviewed emails sent and received between or among CASTLE, Victim-1, other victims, and others, consensually provided or lawfully obtained through court-authorized search warrants. I have also reviewed text messages between CASTLE and Victim-1 and listened to phone calls between Victim-1 and CASTLE recorded by Victim-1. Based on the foregoing, I have learned the following:

2

<u>The Unsuccessful September 2, 2014 Solicitation</u>

      a.  Victim-1 and CASTLE met in or about 2013.  CASTLE represented himself as an experienced businessman and head of his own consulting firm, and subsequently engaged Victim-1 to participate with him in a variety of business ventures.

      b.  In the summer of 2014, CASTLE invited Victim-1 to join CASTLE and several others to start a new international bank holdings company located in Ghana with multiple subsidiaries that would in turn provide financing for entrepreneurs in developing nations (the "Ghana Venture").

      c.  On or about September 2, 2014, CASTLE solicited Victim-1 for a $50,000 investment in connection with the Ghana Venture and sent documents outlining the creation of a company that would be owned in part by CASTLE, Victim-1, and an associate of CASTLE identified by a specific name, referred to herein as Business Associate-1.  The Ghana Venture would be run in part through two companies affiliated with CASTLE, Global Edge Technologies Group LLC, ("GETG"), and CG Capital Consultants USA LLC ("CGCC"). The listed business addresses for GETG and CGCC in the documents sent by CASTLE to Victim-1 were CASTLE's home address in Somers, New York.

      d.  CASTLE provided Victim-1 with a promissory note trough which CGCC would borrow $50,000  from Victim-1 and repay the loan in one year with 3% monthly interest.

      e.  Victim-1 did not sign any of the aforementioned documents or contribute to the Ghana Venture.  According to Victim-1, thereafter, the Ghana Venture did not develop into a functioning company and was abandoned by CASTLE.

<u>The September 10, 2014 Solicitation and Investment</u>

      f.  On or about September 10, 2014, CASTLE again solicited Victim-1 for an investment of $50,000 (the "September 10, 2014 Solicitation").  This time, CASTLE orally represented, in part and substance, that he had previously invested with a United Kingdom-based investment firm called "CapGrow," which was affiliated with another entity called "GroVest," (collectively "CapGrow"), and that guaranteed the safety of the invested principal.  CASTLE invited Victim-1 to invest with CapGrow but stated, in part and substance, that CapGrow had high minimum thresholds for investment, and that Victim-1 could only invest by adding Victim-1's money on top of CASTLE's own investment.  For that reason, CASTLE represented, the investment would be structured as loan between CASTLE and Victim-1 that CASTLE would repay.

      g.  To effectuate Victim-1's investment through CapGrow, CASTLE provided Victim-1 with a promissory note (the "September 10, 2014 Promissory Note"), under which CGCC and GETG, as borrowers, would borrow $50,000 from Victim-1 and repay $56,000 in four months.

      h.  In reliance on CASTLE's representations, Victim-1 signed the September 10, 2014 Promissory Note as lender, and CASTLE signed the note on behalf of CGCC and GETG as borrowers.

3

i.   I have reviewed financial records for GETG's bank account at First Niagara Bank in Mount Kisco, New York ending in digits 4459 (the "First Niagara Account"). CASTLE is a signatory of the account along with his wife. Based on my review of these records, Victim-1's financial records, and conversations with Victim-1, and review of other records and reports, I have learned the following:

      i.   On or about September 11, 2014, a check from Victim-1 for $50,000 was deposited into the First Niagara Account.

      ii.   Contrary to his representations, CASTLE did not invest any of Victim-1's money from the September 10, 2014 Solicitation with any company named CapGrow or any other investment firm. Instead, Victim-1's money stayed in the First Niagara Account, where it was converted for CASTLE's own use through, among other things, bill payments, ATM withdrawals, and checks made out to CASTLE.

      iii.   As of about January 10, 2015, the maturity date for the September 10, 2014 Promissory Note, Victim-1 received less than $20,000 from CASTLE in repayment. After several complaints from Victim-1, CASTLE eventually paid back Victim-1 a total of approximately $52,500 through multiple payments ending in July 2015.

j.   Subsequently, CASTLE solicited Victim-1 for several additional investments and loans under false pretenses, none of which has been repaid by CASTLE in full or in part.

<u>The October 15, 2015 Solicitation and Investment</u>

k.   On or about October 15, 2015, CASTLE solicited Victim-1 for another investment of $50,000 through CapGrow (the "October 15, 2015 Solicitation"). To memorialize the investment, CASTLE asked Victim-1 to execute two promissory notes (the "October 15, 2015 Promissory Notes") for $25,000 each, under which GETG would repay Victim-1 $53,250 in one year.

l.   In reliance on CASTLE's representations, Victim-1 signed the October 15, 2015 Promissory Note as lender, and CASTLE signed the note on behalf of GETG as borrower. On or about October 20, 2015, a $50,000 check from Victim-1 was deposited into the First Niagara Account.

m.   Contrary to his representations, CASTLE did not invest any of Victim-1's money from the October 15, 2015 Solicitation with any company named CapGrow or any other investment firm. Instead, Victim-1's money stayed in the First Niagara Account, where it was converted for CASTLE's own use through, among other things, ATM and cash withdrawals, and checks made out to CASTLE.

n.   From at least in or about October 2015 through about June 2016, when the First Niagara Account was closed, CASTLE withdrew over $60,000 from the First Niagara Account through cash withdrawals and checks made out to himself. Additionally, from at least in or about October 2015 through about February 2017, CASTLE sent at least $110,000 in cash through the money transfer company MoneyGram International Inc. ("MoneyGram") to various accounts in Ghana.

4

### The December 1, 2015 Solicitation and Investment

o.     On or about November 28, 2015, CASTLE used his Yahoo email account to solicit Victim-1 for another $50,000 investment through CapGrow (the "December 1, 2015 Solicitation"). CASTLE's email to Victim-1 stated, in relevant part:

> I just received an offer from CapGrow Trading (those blokes with whom I invest) for 10% simple interest on a one year term note. I have an apportionment [that's what Brits call it] of only $150,000. It commences on December 1st and runs for exactly one year. Principal is guaranteed, as always. I just received the offer this morning. I am going to take $100,000.00 of it. If you would like, I can set the remaining $50,000.00 for you. We could do this with a Promissory Note between us. Please do not discuss this with anyone -- I don't want anyone resenting me for having not shared this information or the open offering with them. I will ring you to discuss this tomorrow. I believe that this is about as good as it is going to get. Our other investments are yielding 6.50%. I personally feel that 10% is significantly above the market at present and for the near-term future. (brackets in original)

p.     CASTLE's representations that he received an offer from CapGrow, that Victim-1's funds and CASTLE's funds had previously been invested with CapGrow, and that such investments were presently "yielding 6.50%" were false.

q.     To finalize the investment, on or about December 1, 2015, CASTLE asked Victim-1 to execute a promissory note (the "December-1, 2015 Promissory Note") for $50,000, under which GETG would repay Victim-1 $55,000 in one year.

r.     In reliance on CASTLE's representations, Victim-1 signed the December 1, 2015 Promissory Note as lender, and CASTLE signed the note on behalf of GETG as borrower.

s.     On or about December 2, 2015, a $50,000 check from Victim-1 was deposited into the First Niagara Account.

t.     Contrary to his representations, CASTLE did not invest any of Victim-1's money from the December 2, 2015 Solicitation with any company named CapGrow or any other investment firm. Instead, Victim-1's money stayed in the First Niagara Account, where it was converted for CASTLE's own use through, among other things, ATM and cash withdrawals, and checks made out to CASTLE.

u.     From at least about December 2, 2015 through about January 11, 2016, CASTLE withdrew approximately $19,200 from the First Niagara Account. During the same time period, CASTLE transferred approximately $37,200 to recipients in Ghana in MoneyGram transactions of $2,000 or less each.

### The January 12, 2016 Solicitation and Investment

     v.    On or about January 12, 2016, CASTLE solicited Victim-1 for a $75,000 investment through CapGrow (the "January 12, 2016 Solicitation"). To effectuate the investment, CASTLE instructed Victim-1 to execute a promissory note (the "January 12, 2016 Promissory Note") for $75,000, under which GETG would repay Victim-1 $86,250 in fifteen months.

     w.    In reliance on CASTLE's representations, Victim-1 signed the January 12, 2016 Promissory Note as lender, and CASTLE signed the note on behalf of GETG as borrower. On or about January 12, 2016, two checks from Victim-1 totaling $75,000 were deposited into the First Niagara Account.

     x.    Contrary to his representations, CASTLE did not invest any of Victim-1's money from the January 12, 2016 Solicitation with any company named CapGrow or any other investment firm. Instead, on about January 13, 2016, CASTLE sent approximately $32,000 from the First Niagara Account to a bank account at Guaranty Trust Bank in Ghana ending in digits 10230 ("Ghana Account-1") for the use of that account's beneficiary ("Ghana Account-1 Owner"). CASTLE converted other funds for CASTLE's own use, including through ATM and cash withdrawals and checks made out to CASTLE.

### The April 8, 2016 Solicitation and Investment

     y.    On or about April 8, 2016 CASTLE solicited Victim-1 for a $100,000 loan (the "April 8, 2016 Solicitation"). CASTLE represented, in part and substance, to Victim-1 that he had a business relationship with Business Associate-1 who held over $200 million in a Ghana bank and owed CASTLE $7 million. CASTLE represented that he needed $100,000 in part to pay certain necessary fees and expenses to facilitate a funds transfer from Business Associate-1's bank account in Ghana to the United States. In return, CASTLE guaranteed the unconditional repayment of $500,000 to Victim-1 by July 1, 2016.

     z.    CASTLE fraudulently concealed from Victim-1 that at the time of this solicitation, and beginning from September 2015, CASTLE had transferred over $400,000 in bank wire transfers and over $80,000 in Western Union and MoneyGram transactions at the direction of Business Associate-1 and affiliates, including funds obtained from Victim-1 and Victim-2 (as described below), without receiving any money back.

     aa.    In reliance on CASTLE's representations, on or about April 15, 2016, Victim-1 wired $100,000 to GETG at the First Niagara Account. On or about April 18, 2016, CASTLE wired $70,000 from the First Niagara Account to Ghana Account-1.

     bb.    Based on my training and experience, I know that the April 8, 2016 Solicitation bears the hallmarks of a common online fraud known as an "advance fee scam," in which fraudsters obtain victim funds by promising an outsized payment to the victim in return for the victim's advance payment of various banking and legal fees.

### The May 4, 2016 Solicitation and Investment

     cc.    From on or about April 20, 2016 and through about May 4, 2016, CASTLE solicited Victim-1 for a $200,000 investment through CapGrow (the "May 4, 2016 Solicitation"). CASTLE sent numerous text messages and emails to solicit this investment, including an email on

or about April 25, 2016 stating that the offer was open for only two weeks and encouraging Victim-1 to borrow the necessary funds from Victim-1's 401-K retirement savings account.

   dd. To effectuate the investment, on or about May 4, 2016, CASTLE instructed Victim-1 to execute a promissory note (the "May 4, 2016 Promissory Note") for $200,000, under which GETG would repay Victim-1 $230,000 in one month.

   ee. In reliance on CASTLE's representations, Victim-1 signed the May 4, 2016 Promissory Note as lender, and CASTLE signed the note on behalf of GETG, as borrower, and personally, as guarantor. On or about May 5, 2016, Victim-1 wired $200,000 to GETG at the First Niagara Account.

   ff. Contrary to his representations, CASTLE did not invest any of Victim-1's money from the May 4, 2016 Solicitation with any company named CapGrow or any other investment firm. Instead, approximately four days after receiving Victim-1's $200,000 investment, GETG wired $200,000 to a bank account at Guaranty Trust Bank in Ghana ending in digits 96230 ("Ghana Account-2") for the use of that account's beneficiary ("Ghana Account-2 Owner").

   gg. The $200,000 wired by CASTLE under false pretenses to Ghana Account-2 was subsequently frozen by local authorities in Ghana pending a criminal prosecution in Ghana of Ghana Account-1 Owner and Ghana Account-2 Owner.

### Fraudulent Solicitations From Victim-2

   5. During the course of this investigation, I have spoken with Victim-2, Associate-1 (as defined below), other individuals, and other law enforcement agents. I have examined various reports and records, including financial records pertaining to Victim-2 and CASTLE. In addition, I have reviewed emails sent and received between or among CASTLE, Victim-2, other victims, and others, as well as other emails lawfully obtained through search warrants. Based on the foregoing, I have learned the following:

#### The January 26, 2016 Solicitation and Investment

   a. In or about November 2015, CASTLE held himself out as a potential investment advisor to Victim-2. On or about January 25, 2016, CASTLE solicited a $150,000 investment from Victim-2. CASTLE represented to Victim-2, in part and substance, that he would invest the money with a business associate referred to here as Business Associate-1. CASTLE stated that he completed multiple prior successful investments with Business Associate-1.

   b. On or about January 26, 2016, CASTLE caused a promissory note (the "January 26, 2016 Promissory Note") to be e-mailed to Victim-2. Pursuant to the note, GETG would borrow $150,000 from Victim-2 and repay $300,000 within three months. The note recited that it was secured by an assignment of an obligation on the part of Business Associate-1 to pay GETG $1 million for consultative services already rendered in full. CASTLE further unconditionally guaranteed repayment of the principal amount of the note.

7

   c. In fact, CASTLE had never completed a successful investment with Business Associate-1. CASTLE fraudulently concealed from Victim-2 that he never met Business Asssociate-1 in person, and that in the prior five months, CASTLE had sent over one hundred thousand dollars to accounts in Ghana at Business Associate-1 without ever obtaining any repayment promised to CASTLE.

   d. In reliance on CASTLE's representations, Victim-2 signed the January 26, 2016 Promissory Note on behalf of Victim-2's company as lender, and CASTLE signed the note on behalf of GETG, as borrower, and personally, as guarantor. On or about January 27, 2016, Victim-2 wired $150,000 to GETG at the First Niagara Account.

   e. On or about January 28, 2016, CASTLE wired $125,000 of Victim-2's funds to Ghana Account-1. CASTLE has not repaid Victim-2 any of the money from the January 26, 2016 Solicitation.

The February 5, 2016 Solicitation and Investment

   f. On or about February 5, 2016, CASTLE solicited a further $100,000 investment from Victim-2 to facilitate the closing of an investment with Business Associate-1 CASTLE again fraudulently concealed and misrepresented his true financial history with Business Associate-1.

   g. On or about February 5, 2016, Associate-1 sent Victim-1 a promissory note (the "January 26, 2016 Promissory Note") at CASTLE'S direction and copying CASTLE. Pursuant to this note, GETG would borrow $100,000 from Victim-1 and repay $200,000 within three months under substantially similar terms as the January 28, 2016 Promissory Note.

   h. In reliance on CASTLE's representations, Victim-2 signed the February 5, 2016 Promissory Note on behalf of Victim-2's company as lender, and CASTLE signed the note on behalf of GETG, as borrower, and personally, as guarantor. On or about February 5, 2016, Victim-2 wired $100,000 to GETG at the First Niagara Account.

   i. On or about February 8, 2016, CASTLE wired $100,000 of Victim-2's funds to Ghana Account-1. CASTLE has not repaid Victim-2 any of the money from the February 5, 2016 Solicitation.

**Additional Solicitations and Steps To Conceal the Scheme**

  6. Based on my participation in this investigation, conversations with other known victims and law enforcement agents, review of financial records pertaining to CASTLE, victims, and others, and review of emails sent or received by CASTLE and others obtained consensually or pursuant to court-authorized search warrants, I have learned the following:

   a. On or about June 8, 2016, CASTLE was voluntarily interviewed by two other FBI agents (the "June 8, 2016 FBI Meeting") after his $200,000 transfer to Ghana Acount-1 was frozen by Ghanaian authorities. Based on my conversation with these agents and review of their report, I have learned that CASTLE stated the following, in part and substance:

8

    i.   CASTLE wired $200,000 from his bank account to the Ghana Account-2 at the direction of Business Associate-1.

    ii.   At Business Associate-1's instruction, CASTLE drafted a letter to have the $200,000 released. The letter falsely stated that CASTLE knew and was a friend of Ghana Account-2 Owner.

    iii.   CASTLE and GETG have no business relationship with Ghana Account-2 Owner, other than wiring the money to Ghana Account-2 Owner at Business Associate-1's request.

    iv.   CASTLE previously sent funds to Business Associate-1 to finance a Ghana mining project.

    v.   CASTLE now believed that he was being defrauded by Business Associate-1.

    b.  In the course of the interview, CASTLE did not disclose that the $200,000 came from a third party, i.e. Victim-1.

    c.  Following the June 8, 2016 FBI Meeting and through at least in or about March 2017, CASTLE continued soliciting funds from Victim-1, Victim-2, and several other actual and potential victims over the telephone and email, among other means. In an effort to regain his own lost money and attract new funds, CASTLE concealed from these victims his losses to Business Associate-1 and affiliates, and the June 8, 2016 FBI Meeting.

    d.  Beginning in or around January 2017, CASTLE encouraged the fraudsters he had been communicating with to contact CASTLE's victims directly to solicit funds under false pretenses. For example, in a skype text conversation on or about January 24, 2017 with an associate of Business Associate-1, CASTLE wrote (brackets added):

> Well, I think you're wearing poor [Victim-2] down. [Victim-2]'s been texting me about your dialogues. . . . [Victim-1] invested $100k. I've been telling [Victim-1] that [Victim-1]'ll get [Victim-1's] money but Fin CEN is holding it up. [Victim-1] believes this. [Victim-1's] telephone number is [omitted] and you'd have to introduce yourself with my name, be very polite (don't plead) and tell [Victim-1] that you have found a way to break Fin CEN's stranglehold via HSBC, etc., etc.,[] Let [Victim-1] continue to think that we have found a workable cure for the FinCEN issue. . . . If [Victim-1] provides $150,000, [Victim-1] expects a return of $750,000 within less than a week. Represent yourself as one of my banking advisors for all of Africa, and that you've come up with this solution. If [Victim-1]'s incredulous, you can tell [Victim-1] to call me. I'm not sure how [Victim-1] has [Victim-1's] money, but [Victim-1] has it in liquid accounts if not right in [Victim-1's] banks. Phone [Victim-1] tomorrow early in the morning -- around 6:00 am New York Time. [Victim-1]'s still expecting $500k back on [Victim-1's] existing $100k investment.

9

e. On or about February 22, 2017, CASTLE unsuccessfully attempted to solicit another $50,000 from Victim-1 in a recorded telephone call. CASTLE reiterated to Victim-1 that Victim-1's outstanding investments of $375,000 had been invested with CapGrow. CASTLE stated, in part and substance, that these CapGrow investments were "independent" of Victim-1's $100,000 loan to CASTLE that had been used to attempt to release Business Associate-1's funds from a bank in Ghana, for which CASTLE needed another $50,000.

f. There is probable cause to believe that CASTLE also made misrepresentations to attempt to preclude his victims from reporting the fraud to law enforcement, thereby concealing his role in the scheme. In or about May 2017, CASTLE sent an email to Victim-1, Victim-2 and other known and potential victims of the scheme, which stated, in part and substance, that

    i. Individuals using two identities, including that of Business Associate-1, perpetrated a fraud upon CASTLE and the recipients of the email, and drove CASTLE to a suicide attempt.

    ii. CASTLE was "now proceeding directly and aggressively (on behalf of all of us) with a special unit of the FBI, a multi-agency task force (which also includes specially-assigned police detectives), the United States Secret Service and the FTC to bring these individuals to justice and to recover whatever balances may be obtainable."

    iii. Injured parties should report to CASTLE any future correspondence with the fraudsters "so that I may make use of the same in my dealings with the authorities."

g. Upon my review of FBI records and databases, I am aware of no record indicating that CASTLE reported this scheme or otherwise contacted the FBI following his interview at the June 8, 2016 FBI Meeting.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of DOUGLAS E. CASTLE, the defendant, and that he be imprisoned or bailed, as the case may be.

DANIE S. SAMUEL
Special Agent
Federal Bureau of Investigation

Affirmed to before me this
13th day of February 2018

THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

10